# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 15, 2011 Session

## STATE OF TENNESSEE v. CARLTON HORTON, aka CARLTON LEAVON HORTON

**Appeal from the Criminal Court for Hamilton County**
**No. 275503      Rebecca Stern, Judge**

---

**No. E2010-02146-CCA-R3-CD - Filed May 19, 2011**

---

The Defendant, Carlton Horton, aka Carlton Leavon Horton, pleaded guilty in the Hamilton County Criminal Court to domestic aggravated assault as a Range I, standard offender. After a sentencing hearing, he received a five-year sentence. The trial court ordered him to serve eleven months and twenty-nine days; the sentence thereafter to be suspended, and the Defendant placed on probation for a period of eight years. The trial court also ordered the Defendant to pay $4,048.10 in restitution to the victim. The Defendant now appeals the restitution award, arguing that the trial court did not consider the Defendant's financial resources or ability to pay as required by statute. We conclude that the trial court made inadequate findings concerning the Defendant's financial resources and his future ability to pay. We therefore reverse and remand for reconsideration of the restitution award based upon the required findings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

W.B. Mitchell Carter, Chattanooga, Tennessee, for the appellant, Carlton Horton, aka Carlton Leavon Horton.

Robert E. Cooper,, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William H. Cox, III, District Attorney General; and William Hall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

A Hamilton County grand jury returned an indictment against the Defendant on March 24, 2010, charging him with domestic aggravated assault, a Class C felony, and attempted second degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-101, -12-107, -13-102, -13-210. On May 27, 2010, the Defendant pleaded guilty to domestic aggravated assault as a Range I, standard offender, and the second degree murder charge was dismissed.[1]

A sentencing hearing was held on July 26, 2010. The presentence report reflects that Officer Lauren Bacha of the Chattanooga Police Department gave the following account of events in the affidavit of complaint:

> Police were dispatched to Memorial Hospital regarding a stabbing victim incident occurred at 407 Derby St. Dispatch advised suspect was still on scene. Upon arrival police spoke to victim, was advised he and his cousin (Def) got into a verbal argument which escalated to a physical altercation. Def and witness stated victim struck Def first. The two ended the physical altercation. Victim back inside to speak with his aunt, Def shortly after went inside and to the kitchen. Def came out of the kitchen with a butcher knife and attacked victim. Victim sustained five (5) stab wounds. Victim was transported to Erlanger from Memorial for further medical treatment. Def was transported to HCJ and is being charged with agg. domestic assault.

The report further provides that the victim submitted hospital bills totaling $4,048.10, and copies of the bills were attached to the report.

James Rox, an employee with the Board of Probation and Parole, testified that he prepared the presentence report in the Defendant's case and that he personally met with the Defendant. After his investigation of the Defendant, Mr. Rox found the following enhancing factors to be applicable to the Defendant: (1) he had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (8) before sentencing, he failed to comply with the conditions of a sentence involving release into the community; and (12) during the commission of the offense, he intentionally inflicted serious bodily injury upon the victim. See Tenn. Code Ann. § 40-35-114(1), (8) & (12).

---

[1] A copy of the guilty plea transcript is not included in the record on appeal.

A copy of the Defendant's criminal record was included in the presentence report, showing a multitude of convictions for leaving the scene of an accident with damage, driving under the influence, drug possession, public intoxication, improper use of 911, aggravated burglary, driving while license suspended, cancelled or revoked, criminal trespass, vandalism, stalking, domestic violence, failure to appear, assault, first degree burglary, grand larceny, and attempted burglary. Moreover, the Defendant had a long history of sentences involving release into the community. In the presentence report, Mr. Rox detailed the Defendant's release history as follows: (1) The Defendant was given a total of twelve years on convictions for grand larceny, attempted burglary, and two counts of burglary; these sentences were suspended on February 6, 1989, and the Defendant successfully completed a five-year probationary period. (2) In September 2004, the Defendant received a three-year sentence for aggravated burglary, cocaine possession, and driving on a revoked license; these sentences were suspended, and he was placed on probation. His probation was revoked on November 27, 2006, for testing positive for cocaine and absconding from supervision. He was given a split sentence; after serving six months in jail, he was again to be released on supervised probation. On September 21, 2007, he was discharged from supervision. We further glean from the presentence report that the Defendant was convicted of DUI on January 18, 2008; this sentence was suspended to probation after service of forty-five days in jail. His probation was revoked on August 20, 2008.

The Defendant reported to Mr. Rox that he graduated from Kirkman Technical High School in 1982, that he had never been married, and that he had no children. Since 2002, the Defendant resided with his aunt at 407 Derby Street. According to the Defendant, he provided "significant support" to his aunt. The Defendant also informed that he was in poor health, having been shot in the leg in 1992 and having liver scarring from a communicable disease. Medical records were requested, but never received. At the sentencing hearing, Mr. Rox was presented with documentation by defense counsel that detailed the Defendant's medical condition (Hepatitis C). As for his mental health, the Defendant described it as poor and relayed that he had been prescribed Zoloft by his primary care physician. The Defendant also reported a long history of substance abuse; however, he claimed to have stopped using drugs after he was diagnosed with the liver illness. The Defendant had received substance abuse treatment in 2001 and 2009. In late 2009, he was discharged from the treatment program against staff advice, and his prognosis was considered poor. He told staff at the start of treatment that, since 1989, he had maintained a $100-a-day cocaine habit.

The Defendant's employment history was also recounted in the presentence report. The Defendant reported work in the food industry as a cook: at Easy Seafood Co. from May 9, 2005, to August 8, 2005, for $9.00 an hour; at Huddle House from August 8, 2005, to August 22, 2005, for $8.00 an hour; and at IHOP from September 1, 2004, to August 1, 2006, for $8.50 an hour. When asked why he was no longer working, the Defendant explained that

he had a female companion for nine years, who had an extended illness, and he stopped working in 2007 to care for her. She died on March 30, 2010. The Defendant claimed to be pursuing disability benefits for himself due to his medical and psychological problems. Mr. Rox did not know from where the Defendant obtained his money, if he had any.

The presentence report shows that the Defendant reported no assets, that he received $200.00 per month in food stamps, and that he owed a debt of $1,100.00 to a loan company.

The victim testified at the sentencing hearing. When asked to describe the incident, the victim gave the following account:

> Well, we was riding and on the way home he wanted to go buy some drugs and I told him no because I was intoxicated and I was going into the house to go to sleep. He kept on and we got in an argument and the argument proceeded to a fight. So at that time I was going to leave and went in to tell my aunt that I was going to leave and not knowing that [the Defendant] had came in the house. . . . I happened to turn around and he was proceeding to stab me with a knife.

The victim detailed further that he was stabbed five times and spent a week in the hospital. He testified that approximately $4,000.00 of his medical bills were not covered by insurance and that he had not been reimbursed for those funds. In the victim impact statement, which was attached to the presentence report, the victim stated, "I believe, he should get as much time as he can get, because it was planned, and he had another route he could have taken, 'just call the police.'"

The forty-seven-year-old Defendant testified at the sentencing hearing; he stated that he was "really and truly sorry" that he stabbed the victim and that he "should have looked for some other way to get out of it." The Defendant then gave his version of the events:

> It started because what he did, try to take me to get some drugs, but I didn't get any. So the money I had he asked me to loan it to him so he could get some beer, and I told him I wouldn't loan it to him. So we got to arguing over my $5. So when we got home in the yard I opened the door and went to take my seatbelt out and he shoved me out the car and I hit my head on the—we had like a foot and a half brick wall runs along that driveway and I hit my head. And he came around and jumped on me and changed—his witness, James Eldridge, broke it up and held him. I went in the house and I got the knife and when he came in I said you're going to leave me the F alone and he lunged at me and we fell back on the couch and I stabbed him. And I gave my

-4-

aunt the knife. She came in there and he got off me and they went up to the hospital.

The Defendant confirmed that he lived with his aunt on Derby Street. When asked what he did in return for his aunt, he stated as follows:

> I cook, I wash clothes. Well, we both split the cooking. I wash clothes. I wash my own clothes and I don't wash her unders. But I cuts the grass, I feed and water the dogs. And go out there and water them down to keep them because in this heat I try to keep them kind of cool. And I cuts my neighbor yard when I cut our yard. And I go gets the dog food. All I get every month is $200 worth of stamps. I take that and put it in the house. I buy the food. Because of her little check she pays the house mortgage. And I'm trying to seek disability.

The Defendant also claimed that he was unable to continue work in the food industry due to his Hepatitis C diagnosis.

The Defendant described his ailments as Hepatitis C, depression, and insomnia. He relayed that he was supposed to start Hepatitis treatment in October and that he had an appointment scheduled with his psychiatrist in October. The Defendant claimed that he was no longer using drugs, his drug of choice being crack cocaine, due to "medical necessity[.]" The Defendant acknowledged that, on the night of the stabbing, he was intoxicated from alcohol.

At the conclusion of the hearing, the trial court sentenced the Defendant to five years, as a Range I, standard offender, for his Class C felony conviction. His sentence was to be suspended following service of eleven months and twenty-nine days, and the Defendant was to be placed on probation for eight years. The trial court also ordered restitution be paid to the victim in the amount of $4,048.10. The Defendant timely appealed.

**Analysis**

On appeal, the Defendant challenges only the award of restitution, arguing that the trial court failed to consider the financial resources and future ability of the Defendant to pay the restitution amount, findings required by Tennessee Code Annotated section 40-35-304(d). The record reflects that the restitution amount of $4,048.10 was based upon the unpaid medical bills of the victim. The victim testified that insurance had not paid this sum and that he had not been reimbursed for these bills. His medical bills were attached to the presentence report. In imposing the restitution award, the trial court briefly stated as follows:

So conditions: A&D assessment, treatment as recommended. And restitution in the amount of $4,048.10. His probationary period I'm going to make longer. Suspended for eight years. So he's going to be suspended for eight years after he does 11/29. All right.

When a defendant challenges the validity and amount of restitution, this Court must conduct a de novo review of both the amount of restitution ordered and the method by which it was determined. State v. Johnson, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997) (citing Tenn. Code Ann. § 40-35-401(d) (1990); State v. Frank Stewart, No. 01-C-019007CC00161, 1991 WL 8520, at *1 (Tenn. Crim. App., Nashville, Jan. 31, 1991)). The trial court is entitled to a presumption of correctness. Tenn. Code Ann. § 40-35-401(d).

A trial court, in conjunction with a probated sentence, may order a defendant to make restitution to the victims of the offense. See Tenn. Code Ann. § 40-35-304(a). "The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." Johnson, 968 S.W.2d at 885. The statue that governs restitution as a condition of probation provides, in pertinent part, as follows:

> (b) Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss.

> (c) The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments. The court may not establish a payment or performance schedule extending beyond the statutory maximum term of probation supervision that could have been imposed for the offense.

> (d) In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform.

> (e) For the purposes of this section, "pecuniary loss" means:

> (1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

> (2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution

of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(b)-(e).

Special damages are those which are "'the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence.'" State v. Lewis, 917 S.W.2d 251, 255 (Tenn. Crim. App. 1995) (quoting Black's Law Dictionary 392 (6th ed. 1990)). General damages are those which are "'the necessary and immediate consequence of the wrong.'" Id. (quoting Webster's New International Dictionary 664 (2d ed. 1957)). It is unnecessary for the sentencing court to determine restitution in accordance with the strict rules of damages applied in civil cases. Johnson, 968 S.W.2d at 887.

The sum of restitution ordered must be reasonable and does not have to equal the precise pecuniary loss. State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). There is no set formula. Johnson, 968 S.W.2d at 886. The sentencing court must consider not only the victim's loss but also the financial resources and future ability of the defendant to pay. Tenn. Code Ann. § 40-35-304(d); State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). In ordering restitution, the trial court shall specify the amount of time and payment and may permit payment or performance of restitution in installments. Tenn. Code Ann. § 40-35-304(c). The court may not, however, establish a payment or schedule extending beyond the expiration of the sentence. Tenn. Code Ann. § 40-35-304(g)(2). If the defendant, victim, or district attorney petitions the trial court, it may hold a hearing and, if appropriate, waive, adjust, or modify its order regarding restitution. Tenn. Code Ann. § 40-35-304(f). Further, any unpaid portion of the restitution may be converted to a civil judgment. Tenn. Code Ann. § 40-35-304(h)(1); Bottoms, 87 S.W.3d at 108.

On appeal, the Defendant does not argue that the evidence presented was insufficient to establish the amount of the victim's loss, only that the trial court did not make the findings required by Tennessee Code Annotated section 40-35-304(d). First with regard to the amount of the victim's loss, there was sufficient evidence to allow the trial court to make a reasonable, reliable determination as to the amount of the victim's pecuniary loss ($4,048.10). At the sentencing hearing, the victim testified to the amount of his uncompensated medical bills, and copies of his bills were attached to the presentence report.

However, we agree with the Defendant that the trial court did not consider the Defendant's financial resources and his future ability to pay or perform as required by statute. See Tenn. Code Ann. § 40-35-304(d). The State acknowledges that this Court has remanded several cases due to the trial court's failure to take into consideration a defendant's financial

resources and ability to pay in setting a restitution award. See, e.g., State v. Victor Wayne Browning, No. M2009-00509-CCA-R3-CD, 2010 WL 877523, at *7-9 (Tenn. Crim. App., Nashville, Mar. 12, 2010); State v. J. Steven Brasfield, No.W2009-00026-CCA-R3-CD, 2010 WL 669222, at *2-4 (Tenn. Crim. App., Jackson, Feb. 25, 2010); State v. Steven Watson, No. W2008-00452-CCA-R3-CD, 2009 WL 2407752, at *12-14 (Tenn. Crim. App., Jackson, Aug. 6, 2009); State v. Timothy McGuire Woods, No. M2008-00103-CCA-R3-CD, 2008 WL 5272534, at *3-5 (Tenn. Crim. App., Nashville, Dec. 19, 2008). The State argues that this case is different because, here, the Defendant "provided next to no information about his financial circumstances." However, this lack of information appears to exist because there is no more information than what was provided by the Defendant. The record established that the Defendant stopped working as a cook in 2007 to care for his ill companion. No mention was made of his earnings because apparently he had none. The Defendant also claimed that he was unable to continue work in the food industry due to his Hepatitis C diagnosis. The Defendant reported no assets, that he received $200.00 per month in food stamps, and that he owed a debt of $1,100.00 to a loan company. He was also said to reside with his aunt, contributing only his food stamps to the household and performing chores for his aunt. The Defendant claimed to be pursuing disability benefits for himself due to his medical and psychological problems. However, we note that, contrary to this poor financial outlook, the Defendant did report to treatment staff in late 2009 that he had maintained a $100-a-day cocaine habit since 1989, ostensibly obtaining this money by some means. These are considerations for the trial court upon remand. The restitution award is remanded for additional determinations concerning the Defendant's financial resources and future ability to pay.

**Conclusion**

After a review of the record, we remand the restitution award for additional considerations in accordance with this opinion.

_____
DAVID H. WELLES, JUDGE

-8-